IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00959–EWN

DWAYNE R. GAVIN,

    Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

    Defendant.

---

**ORDER AND MEMORANDUM OF DECISION**

---

       This is a social security benefits appeal under 42 U.S.C.A. § 405(g) (West 2007). Plaintiff Dwayne Gavin challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying his application for disability insurance benefits. Jurisdiction is premised upon 42 U.S.C.A. § 405(g) (West 2007).[1]

---

[1] Although the caption in this case does not reflect it, on February 12, 2007, Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of Social Security.

**FACTS**

*1.   Medical Evidence*

Plaintiff was born on January 20, 1971, and was thirty-one years old at the onset of his alleged disability. (Admin. R. at 56 [filed Aug. 7, 2006] [hereinafter "Admin. R."].) Plaintiff has a tenth grade education and has worked in the vocationally relevant past as a packager, food packager, store laborer, and cook. (*Id.* at 71, 312.) Plaintiff alleges that he became unable to work beginning on June 1, 2002, due to bipolar disorder, back pain, and headaches.[2] (*Id.* at 56, 70.)

On March 19, 2001, Plaintiff began receiving mental health treatment at the Spanish Peaks Mental Health Center ("Spanish Peaks") in Pueblo, Colorado. (*Id.* at 269.) On that date, Plaintiff was admitted on an emergency basis for anxiety, loss of appetite, paranoia, and other symptoms of bipolar disorder and mania. (*Id.* at 269–71.) Treatment notes reflect that Plaintiff had not been taking his medications for at least one year. (*Id.* at 268–69.) Plaintiff received medications to stabilize his condition and was discharged on March 26, 2001. (*Id.* at 259–68.)

On April 26, 2001, Plaintiff reported to Spanish Peaks care providers that he would soon start working part-time as a cook. (*Id.* at 257.) In May and June 2001, Plaintiff repeatedly complained that he was "in conflict about working because much of his [pay] check [would] be

---

[2]Bipolar disorder is a mood disorder marked by the occurrence of one or more manic episodes (with symptoms of irritable or elevated mood, excessive self-esteem, talkativeness) that alternate with major depressive episodes (with symptoms of loss of interest in one's activities, disturbance of sleep, loss of appetite, difficulty in thinking). 1–B J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 2573 (Matthew Bender 2005).

taken to pay past [sic] back child support." (*Id.* at 256, 254–55.) Plaintiff continued to receive regular counseling and treatment at Spanish Peaks until October 2001. (*Id.* at 248–57.) Treatment notes from October 17, 2001 reflect that Plaintiff was working more than seventy hours a week at three jobs as a cook, but was "frustrated by the large [percentage] of monies being taken out for child support." (*Id.* at 248.)

On August 12, 2002, a Spanish Peaks care provider reviewed Plaintiff's chart and noted that Plaintiff had not visited any Spanish Peaks doctors since October 25, 2001. (*Id.* at 250.) The provider noted that Plaintiff's last prescription was written on October 5, 2001 and did not provide for any refills. (*Id.*) The care provider noted her attempt to call Plaintiff to determine whether he needed further services from Spanish Peaks. (*Id.*)

On October 10, 2002, Plaintiff was again admitted at Spanish Peaks for paranoia and mania. (*Id.* at 143.) Treatment notes reflect that Plaintiff had not been taking his medications for one year and had "walked off [his] job." (*Id.* at 245.) On October 25, 2002, Lorraine Barton-Haas, M.D. diagnosed Plaintiff with bipolar disorder. (*Id.* at 171.) Dr. Barton-Hass opined that Plaintiff could work a regular occupation, but would not be able to work for a year or more. (*Id.* at 172.) Plaintiff underwent therapy, was prescribed medications, and was released from Spanish Peaks on November 1, 2002. (*Id.* at 209–45.) On the date of his discharge, Dr. Barton-Hass gave Plaintiff a Global Assessment of Functioning ("GAF") score of fifty-five.[3]

---

[3]The GAF scale is a tool for rating an individual's social, occupational, and psychological functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000). A GAF score between fifty and sixty indicates: (1) moderate symptoms, such as flat affect and circumstantial speech or occasional

On November 13, 2002, Spanish Peaks clinical nurse specialist Karen Hyland evaluated Plaintiff. (*Id.* at 206–08.) Ms. Hyland found that Plaintiff had intact remote and recent memory, linear thought processes, and a good attention span. (*Id.*) Ms. Hyland accorded Plaintiff a GAF score of fifty and suggested that he return to the clinic once a month for treatment. (*Id.* at 208.) Plaintiff continued treatment at Spanish Peaks through April 2003, undergoing six individual therapy sessions and receiving medications on six occasions. (*Id.* at 192, 194–202.)

On January 3, 2003 state agency physician Ellen Ryan, M.D. reviewed Plaintiff's medical records and assessed Plaintiff's mental residual functional capacity ("RFC"). (*Id.* at 93–95.) Dr. Ryan found that Plaintiff was not significantly limited in most areas, but was moderately limited in his abilities of social interaction. (*Id.*) Dr. Ryan found that Plaintiff could "follow simple instructions, sustain an ordinary routine, make simple work related decisions[,] . . . accept supervision if not frequent or prolonged," and work in an environment with limited interaction with the public and co-workers. (*Id.* at 95.)

On December 23, 2003, care providers at Spanish Peaks closed Plaintiff's file because they "[had] had no contact with him in several months" and Plaintiff had "failed to respond to letters sent." (*Id.* at 192.) Notes on the closure reveal that Plaintiff's last contact with Spanish Peaks was on July 8, 2003, when he reported "even moods, better sleep, and an increased ability to focus." (*Id.*)

---

panic attacks; or (2) moderate difficulty in social, occupational, or school functioning, such as maintaining few friends or involvement in conflicts with peers or coworkers. *Id.*

On March 10, 2004, psychologist Carlos Rodriquez, Ph.D. completed a form stating his opinion that Plaintiff was disabled and unable to work for at least one year due to post-traumatic stress disorder ("PTSD"), bipolar disorder, and alcohol abuse.[4] (*Id.* at 169–70.) Plaintiff testified that Dr. Rodriguez never treated or "dealt with" him, but brought him into his office, wrote down whatever Plaintiff said was wrong, and signed the opinion. (*Id.* at 306.)

On May 17, 2004, Plaintiff presented to the Department of Veterans' Affairs ("VA") for treatment of his bipolar disorder and PTSD. (*Id.* at 191.) On June 8, 2004, Plaintiff visited psychiatrist Robert Vadnal, Ph.D., complaining of mood swings, depression, and rapid thinking. (*Id.* at 190.) Plaintiff reported that he had not taken any medications for approximately one year. (*Id.*) Dr. Vadnal prescribed medications and instructed Plaintiff to return in six weeks. (*Id.*) Plaintiff continued treatment at the VA through 2005. (*Id.* at 177–91.)

On September 1, 2004, Dr. Vadnal wrote a letter stating that, due to the severity of Plaintiff's PTSD and bipolar disorder symptoms, "it [was] felt he [was] unable to find and maintain gainful employment." (*Id.* at 161.) On October 1, 2004, Plaintiff reported to VA care providers that his symptoms were more manageable. (*Id.* at 180.) On January 7, 2005, Plaintiff reported that he felt the medications helped his symptoms, but he was anxious and had been having difficulty leaving his house. (*Id.* at 179.) On February 2, 2005, Dr. Vadnal opined that Plaintiff's condition had improved due to the medications he had been prescribed. (*Id.* at 177.)

---

[4]PTSD is "a syndrome occurring after a person experiences trauma outside the range of normal human experience." 4–P J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 8552 (Matthew Bender 2005). PTSD symptoms include flashbacks, nightmares, severe stress with numbness to stimuli resembling the trauma, anxiety, and depression. *Id.*

On March 15, 2005, Dr. Rodriquez again opined that Plaintiff would not be able to work for a period of one year or more, due to his bipolar disorder, PTSD, and alcohol and marijuana abuse. (*Id.* at 275–76.) Dr. Rodriquez noted Plaintiff's statement that his substance abuse problems were in remission. (*Id.* at 276.)

On March 17, 2005, Dr. Vadnal completed a mental RFC assessment form concerning Plaintiff. (*Id.* at 162–68.) Dr. Vadnal opined that Plaintiff had moderate or marked limitations in sustained concentration and persistence, social interaction, and adaptation. (*Id.* at 162–63.) Further, Dr. Vadnal opined that Plaintiff's mental impairments would cause: (1) concentration lapses; (2) problems completing tasks in a timely manner; (3) problems with arriving at work on time and attending work five days per week; (4) distraction upon working with others; (5) problems interacting with the general public; and (6) problems adhering to social norms including neatness and cleanliness. (*Id.* at 164–67.)

### *2. Procedural History*

On October 15, 2002, Plaintiff filed an application for disability insurance benefits. (*Id.* at 56–65.) On January 7, 2003, the Social Security Administration denied Plaintiff's application. (*Id.* at 51–55.) On February 5, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 49.) On May 6, 2005, the ALJ held a hearing, at which Plaintiff and a vocational expert ("VE") testified. (*Id.* at 296–334.)

Plaintiff testified that he was divorced and lived with his father and grandfather. (*Id.* at 304.) Plaintiff stated that he did some "heavy drinking . . . on the weekends with friends" from June 2002 through December 2002, but drank "a couple of beers a week at the most" in 2003 and

2004 "during the summer months," and had not drunk alcohol at all in 2005. (*Id.* at 304–05.) Plaintiff testified that he no longer used marijuana as of mid-2004. (*Id.* at 305.)

Plaintiff testified that he had problems with concentration, memory, and following instructions. (*Id.* at 300.) Plaintiff stated that stress exacerbated these problems. (*Id.*) Plaintiff testified that he had difficulty socializing and his mental health problems had worsened since 2003. (*Id.* at 301–02.) Plaintiff opined he could no longer work because he "couldn't handle the stress." (*Id.* at 302.) Plaintiff clarified that his stress did not necessarily pertain to his job, and "just being out in public [was] stressful enough." (*Id.* at 307.) Plaintiff explained that when he felt stress "[e]verything [fell] apart" and he would lock himself in his room and refuse to leave. (*Id.* at 302–03.)

Plaintiff stated that an example of stress he felt involved working twenty hours per day, six days per week while trying to buy a house. (*Id.* at 303.) Evidently, Plaintiff "[f]ound out [he] was getting ripped off," which caused Plaintiff to feel that he could not longer "handle [his] job." (*Id.*) Plaintiff explained that, generally, when he took a job he would excel, then "become a workaholic and [] burn [himself] out." (*Id.* at 307.) Plaintiff stated that he did not believe he could work because he was afraid and stressed at the prospect of learning a new job and dealing with a group of new people. (*Id.* at 310.) Plaintiff stated further that he felt stress because the State of Colorado had revoked his driver's license several times. (*Id.* at 310–11.)

Plaintiff testified that he had left his last three jobs, not because he could not perform the work, but because: (1) he could not "work [his] way up" and "walked away" from one job; (2) he was fired from another job due to the problematic actions of his friend; and (3) he quit a third job

because too much child support was being garnished from his wages and he could not afford to live on his net pay. (*Id.* at 308–10.)

Subsequently, the VE testified at the hearing regarding his review of the vocational exhibits in Plaintiff's file. (*Id.* at 311–34.) The VE testified that Plaintiff's past work: (1) as a packager, store laborer, and food packager were all jobs with a skill level of two requiring medium exertion; and (2) as a cook was a job with a skill level of seven requiring medium exertion. (*Id.* at 313.) The VE then opined on a series of hypothetical questions posed by the ALJ. (*Id.* at 313–15.) The VE testified that an individual of the same age as Plaintiff, with the same educational background and no exertional limitations, limited to low-stress, non-complex work that involved no dealing with the general public and only occasional interaction with co-workers, could not perform Plaintiff's past work. (*Id.* at 313.) The VE opined that such a person could perform the jobs of surveillance system monitor or small products assembler. (*Id.*) The VE opined that the same individual, subject to the additional limitation of an unpredictable "inability to sustain any interaction with other persons" could not perform any work. (*Id.* at 314.) Subsequently, Plaintiff's counsel questioned the VE at length as to the nature of the jobs the VE opined Plaintiff could perform and the data sources concerning the jobs. (*Id.* at 314–34.)

On July 5, 2005, the ALJ issued a decision reflecting his findings that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at 11–20.) In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since June 1, 2002. (*Id.* at 12.) The ALJ next determined that Plaintiff's bipolar disorder and PTSD were medically determinable, severe impairments. (*Id.*) Despite their severity, the ALJ

determined that the impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id*. at 13.) Additionally, the ALJ found that Plaintiff's complaints of mental limitations were not persuasive, because Plaintiff "testified that his reasons for leaving his last two jobs were for reasons [sic] other than his mental impairments." (*Id.* at 14.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC "to perform work-related activities with no exertional limits, as he ha[d] no [medically] determinable physical impairments." (*Id.*) The ALJ found Plaintiff could perform work that: (1) did not involve complex tasks; (2) required a low stress level; (3) did not involve dealing with the general public; and (4) provided for occasional interaction with co-workers. (*Id.*) In accord with this RFC, the ALJ determined that Plaintiff was not disabled because he could perform work as a surveillance system monitor or small products assembler, which were both jobs existing in significant numbers in the national economy. (*Id.* at 20.)

On April 3, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making it the final administrative decision for the purposes of judicial review. (*Id.* at 4–6.) On May 23, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed May 23, 2006].) On October 10, 2006, Plaintiff filed his opening brief. (Pl.'s Opening Br. [filed May 23, 2006] [hereinafter "Pl.'s Br."].)

**ANALYSIS**

*1.    Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C.A. § 1383(c)(3) (West 2007) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C.A. § 405(g) (West 2007). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

### 2. *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.A. § 1382c(a)(3)(A) (West 2007). In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be

disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d) (2007). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

### 3.     *Disability Determination*

Plaintiff does not dispute the ALJ's findings at steps one through four. (*See* Pl.'s Br.) Plaintiff only argues the ALJ erred at step five by: (1) relying on the VE's testimony concerning jobs as a small products assembler and surveillance system monitor; and (2) failing to state the number of small products assembler and monitor jobs that exist in Colorado. (*Id.*) The court addresses each point in turn.

### *a.      VE Testimony*

Plaintiff argues that the ALJ erroneously relied on the VE's testimony concerning the availability of the jobs Plaintiff could perform. (*Id.* at 11–14.) First, Plaintiff argues that the VE knew the number of small products assembler jobs should be eroded, because some jobs had a high stress level, but could not estimate the amount of erosion. (*Id.* at 11.) Accordingly, Plaintiff argues that the VE's "vague and imprecise testimony" was not substantial evidence upon which the ALJ could rely. (*Id.*) Plaintiff's argument mischaracterizes the testimony presented.

The VE testified that because stress was not rated in the Classification of Jobs ("COJ"),[5] it was "[n]ot a significant factor." (Admin. R. at 315.) The VE explained that in the COJ, "every job [has] the primary components of temperament consideration, and stress in that particular job is not a consideration." (*Id.*) The VE then cautioned that he had seen small products assembler jobs "where there was tremendous pressure put on people to produce" and, therefore, there "could be" some erosion to the number of available jobs, but the VE was careful to note that "[g]enerally speaking, [stress was] not an issue or it would be rated that way in the DOT and COJ." (*Id.* at 316.)

An ALJ may use VE testimony "to verify, clarify, and supplement information available in publications the [Social Security Agency] has deemed reliable." *Haddock v. Apfel*, 196 F.3d 1084 (10th Cir. 1999). Here, the VE noted that the small products assembler jobs were not considered stressful according to the COJ and DOT. (Admin. R. at 315–16.) The VE supplemented this

---

[5]The COJ is the companion guide to the Dictionary of Occupational Titles ("DOT"). (*See* Admin. R. at 315.)

position with his own experiences witnessing stressful jobs and opined that, because of this, there

"*could be*" some limitation on the number of jobs set forth in the statistical data. (*Id.* [emphasis

added].) This conditional phrase does not change or otherwise affect the VE's express testimony

that, "[g]enerally speaking," stress was not a significant factor in the job. (*Id.* at 315.)

Accordingly, the court finds no error. Even under the most generous construction of Plaintiff's

arguments, this court can only stretch to find harmless error where the ALJ accepted the VE's

numbers of small parts assembler jobs available in the national economy without erosion. *See

Glass v. Shalala*, 43 F.3d 1392, 1397 (10th Cir. 1994) (holding error harmless where evidence

issue would not have unfairly affected the ultimate result).

   Next, Plaintiff argues that the ALJ erred in relying on the VE's testimony as to the job of

surveillance system monitor. (Pl.'s Br. at 12–14.) Plaintiff argues that the number of jobs

available should have been reduced because some jobs require more personal contact and are

more stressful than provided for in his RFC. (*Id.*) Therefore, Plaintiff argues, the VE was unable

to determine the correct number of jobs available and the ALJ erred in relying on the numbers the

VE presented. (*Id.*) Plaintiff's arguments are unavailing. Plaintiff's RFC provided that he could

perform low-stress jobs in which he did not deal with the general public and only occasionally

dealt with co-workers. (Admin. R. at 14.) Regarding the stress level, according to the VE,

neither the DOT nor the COJ includes stress as a factor in characterizing the job of surveillance

system monitor. (*Id.* at 315.) Accordingly, the same logic set forth above concerning small parts

assembler jobs applies. The fact that the VE testified that there *could* theoretically be high-stress

monitor jobs contained in the figures given cannot serve to defeat the substance or usefulness of

the VE's testimony that under the DOT and COJ, stress was not a significant factor in performing the jobs. (*Id.* at 322.) Just as before, the court finds no error in the ALJ's reliance on the VE's figures. At best, any error would be harmless, under the same reasoning set forth above. *See Glass*, 43 F.3d at 1397.

As to the requirement of dealing with people, Plaintiff underscores that the COJ and the VE's testimony suggest the surveillance system monitor jobs require "dealing with people." (Pl.'s Br. at 13.) Plaintiff then baldly asserts that "though the hypothetical [posed by the ALJ] included no dealing with the general public and only occasional interaction with co-workers[,] the VE did not take these limitations into account." (*Id.*) Finally, Plaintiff makes much ado about the VE's statement that he was "sure" there were surveillance monitor jobs that required significant contact with people, but he was not "aware of them." (*Id.*; *see also* Admin. R. at 318.) Plaintiff yet again mischaracterizes the nature and substance of the VE's testimony.

The VE testified that the surveillance system monitor job "[came] up a lot" and he had had the opportunity to observe several such jobs. (Admin. R. at 319.) The VE explained that the job involved watching films or live security cameras for any signs of foul play, which "[did not] involve much human contact until [one] happen[ed] to see something." (*Id.*) When Plaintiff's counsel pressed the VE further in questioning, the VE stated his belief that he "[did not] think there's any job [wherein] [one] never [had] contact with anybody." (*Id.* at 324.) The VE explained that the monitor job required "[v]ery minimal contact," which he then clarified as "[l]ess than occasional, but more than rare" contact with co-workers. (*Id.*) This court is at an utter loss to understand how the VE's testimony reflects a job that is anything other than *compatible* with

Plaintiff's RFC limitation to no dealing with the general public and only occasional dealing with co-workers. (*Id.* at 14.) Accordingly, the court finds no error in the ALJ's reliance on the VE's testimony concerning the surveillance monitor jobs.

### b. *Jobs Existing in Colorado*

Finally, Plaintiff argues the ALJ followed an incorrect legal standard by failing to state the number of surveillance system monitor and small parts assembler jobs that exist in Colorado. (Pl.'s Br. at 12, 14.) Plaintiff's argument is disingenuous. As stated above, at step five, an ALJ must determine whether there is availability in the national economy of the type of work a claimant has been deemed able to perform. *See* 20 C.F.R. § 404.1520(f) (2007). Here, the ALJ determined that Plaintiff could work as a "surveillance system monitor with 30,000 jobs nationally and small products assembler with 54,000 jobs nationally." (Admin. R. at 20.) Plaintiff himself argues that under the Code of Federal Regulations, "the phrase *national economy* is a term of art meaning the region where the [p]laintiff lives or in several other regions of the country." (Pl.'s Br. at 14 [emphasis in original].) The court is at a loss as to how the requirement that the relevant jobs exist in "*several other regions of the country*" conveys that an ALJ must set forth the number of jobs existing in the state in which a particular claimant lives — and Plaintiff does nothing to clarify the issue. Indeed, the statute clarifies that:

> work exists in the national economy when it exists in significant numbers either in the region where you live *or in several other regions of the country. It does not matter whether —*
> *(1) Work exists in the immediate area in which you live*;
> (2) A specific job vacancy exists for you; or
> (3) You would be hired if you applied for work.

-16-

20 C.F.R. § 404.1566(a) (2007) (emphasis added).  Under the plain meaning of this language, the court simply cannot find that the ALJ had any obligation to set forth the number of small parts assembler and monitor jobs available in Colorado.  Accordingly, the court finds that the ALJ applied a proper standard and did not err in failing to do so.

### *4.    Conclusion*

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 19th day of September, 2007.

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge